STATE of Wisconsin, Plaintiff-Respondent,

v.

Daniel L. SCHMIDT, Defendant-Appellant.†

Court of Appeals

*No. 2015AP457–CR. Submitted on briefs October 13, 2015.*
*—Decided June 7, 2016.*

2016 WI App 45

(Also reported in 884 N.W.2d 510.)

† Petition for Review Filed.

139

140

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Timothy Provis*, Port Washington.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Brad D. Schimel*, attorney general, and *Daniel J. O'Brien*, assistant attorney general.

Before Stark, P.J., Hruz and Seidl, JJ.

¶ 1. HRUZ, J. Daniel Schmidt appeals a judgment of conviction for two counts of intentional homicide and an order denying his postconviction motion. A jury determined that Schmidt killed Kimberly Rose, with whom he had an affair, and her brother, Leonard Marsh. Schmidt challenges the sufficiency of the evidence supporting only his conviction for killing Marsh. He also argues he is entitled to a new trial because the circuit court erroneously concluded he had waived the marital privilege with respect to his statement to his wife that he would like to "shoot [Rose], then myself." Finally, Schmidt asserts the court erroneously, and unconstitutionally, excluded expert witness testimony from a child psychologist whom Schmidt retained to testify regarding potential suggestive interview techniques used during police interviews with Rose's son, D. R.

¶ 2. We reject Schmidt's arguments and affirm the judgment and order. The evidence was plainly sufficient to support the homicide conviction for killing Marsh. The circuit court also correctly concluded Schmidt waived the marital privilege pursuant to Wis.

145

Stat. § 905.11 by disclosing a "significant part" of the communication at issue to a third party when he confirmed to authorities that he told his wife he wanted to kill himself but denied saying he wanted to shoot Rose.[1] Finally, we conclude Schmidt was not constitutionally entitled to present his desired expert testimony regarding suggestive interview techniques, and the circuit court did not otherwise err in excluding it. There was no evidence such techniques were used with D. R., and Schmidt's expert offered no opinion in that regard. Accordingly, Schmidt failed to establish his expert's testimony constituted relevant evidence with probative value that was not substantially outweighed by the risk of unfair prejudice to the State.

## BACKGROUND

¶ 3. In September 2012, the State charged Schmidt with two counts of first-degree intentional homicide for the shooting deaths of Rose and Marsh on Tuesday, May 19, 2009. The bodies were discovered in a residence Rose and Marsh shared. Marsh was found lying face down on a bed, having suffered wounds to the back from what authorities believed were three, 20–gauge shotgun blasts. Rose had suffered fatal wounds to the head, neck and chest from a single shotgun blast at close range. Over time, police eliminated several suspects, leading them to focus on Schmidt.

¶ 4. Stephanie, Schmidt's wife, testified at the trial. Stephanie became suspicious in late 2008 that Schmidt was having an affair with Rose. Stephanie's suspicions were confirmed at the end of April 2009 when

---

[1] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

Schmidt admitted to the affair. Schmidt and Stephanie decided to stay together, and Stephanie stated from that point Schmidt was "just about kissing the ground [Stephanie] walked on."

¶ 5. Stephanie offered testimony discussing the events between Friday, May 15, and Tuesday, May 19, 2009, the day of Rose's and Marsh's deaths. Stephanie testified that on Friday, five days before the murders, she and Schmidt had a discussion about the affair. Stephanie was "heartbroken" and "felt like [Schmidt] was carrying on with every day doings." Stephanie stated Schmidt responded with a comment about his concern for their marriage, and then he said: "I'd like to shoot her, then myself."

¶ 6. Stephanie testified about a $1,000 loan Rose had given Schmidt in early 2009 to help him purchase a motorcycle. After Stephanie learned of the affair, the loan was a source of tension in Schmidt and Stephanie's relationship because it required continuing contact with Rose. In addition, Stephanie had recently lost her job and had no income. On Schmidt's behalf, Stephanie delivered to Rose what was supposed to be one hundred dollars' worth of marijuana from Schmidt's grow operation as a partial, in-kind payment of the debt.

¶ 7. On Sunday, two days before the murders, Stephanie received a text message from Rose stating, among other things, "[p]ay back is a bitch," which Stephanie took to suggest Rose felt cheated by the amount or quality of the marijuana. The text message contained a picture that Stephanie could not open on her phone, so Stephanie went to Rose and Marsh's residence to confront Rose about the picture and determine what it was. There, Rose told Stephanie that she had other pictures with Schmidt and that the two had sex one time in Stephanie's car. Rose also told

147

Stephanie she kept a written journal documenting the affair. Stephanie made arrangements with Rose to return on Thursday, May 21, to view the journal.

¶ 8. After leaving Rose's house, Stephanie went to Schmidt's workplace and confronted him. Schmidt denied having sex in the car and told Stephanie to ignore Rose's claim that she kept a journal. Stephanie was upset and threw her wedding ring at Schmidt. She returned to her residence on Sunday night and packed some clothes, then drove around by herself until very early in the morning on Monday, when she returned home. Stephanie testified that on Monday night, she stayed at home with Schmidt. However, when interviewed prior to trial, Stephanie had been equivocal about her whereabouts that night.

¶ 9. Stephanie testified she was also at her and Schmidt's residence the next morning, the Tuesday of the murders. According to Stephanie, Schmidt left for work at his normal time, approximately 4:00 a.m. Schmidt arrived back home between 9:15 and 9:20 a.m. and appeared irritated and upset. Schmidt left again at 9:30 a.m. in Stephanie's car. Stephanie told police that before leaving, Schmidt made a comment about him picking up their daughter from preschool, which Stephanie thought was "bizarre" because she did not need to be picked up until 11:00 a.m. Schmidt returned home between 10:30 and 10:35 a.m. He appeared to be in a better mood. When Schmidt returned, he parked the car in the garage, which Stephanie found unusual. When Stephanie questioned him about this, he responded he wanted to "keep the sunlight off of it because it's getting kind of beat up." Schmidt was home a very short time before he left to pick up their daughter.

148

¶ 10. Stephanie learned of Rose's and Marsh's murders in the afternoon that Tuesday. When Stephanie told Schmidt about the murders, he had "no major reaction" and did not seem upset.

¶ 11. According to Stephanie, Schmidt offered different explanations for his disappearance on the morning of the murders. Schmidt initially claimed he just "went for a ride" to "clear his mind." Later, Schmidt claimed he intended to visit a friend, Robert Koeller, in Clintonville, Wisconsin, but while en route he realized he did not have enough time to complete the trip before he had to pick up their daughter, and he turned around. Stephanie investigated this assertion by requesting video footage from businesses along the route Schmidt claimed to have taken. The footage Stephanie requested from a bar did not show Stephanie's vehicle passing by at any time. When Stephanie confronted Schmidt with this information, he said it was possible he took a different route.

¶ 12. Stephanie also testified Schmidt owned a 20–gauge shotgun with a rusty barrel and a wooden stock. She saw the gun at their residence prior to the murders. On Tuesday, when Stephanie learned of the murders and discussed them with Schmidt, he talked about the idea of getting rid of the gun. Eventually, believing the gun would implicate Schmidt in the murders, Stephanie agreed he should get rid of it, although she testified she later changed her mind. On Wednesday, May 20, Schmidt told Stephanie he was giving the gun to a friend, Orlin Sanapaw. Stephanie saw a new gun at the residence two days after the murders, which Schmidt claimed was the same gun. Eventually, Schmidt told Stephanie that Sanapaw had destroyed the rusty shotgun.

149

¶ 13. Rose's son, D. R., who was eleven-and-one-half years old at the time of the homicides, also testified at trial. D. R. was living with Rose and Marsh when they were murdered. He testified Schmidt and Stephanie "came around a lot," and he confirmed his mother had loaned Schmidt money to buy a motorcycle. D. R. overheard arguments between Schmidt and Rose about the loan and their relationship, and he in particular recalled arguments about a loan payment in marijuana. D. R. testified Rose was not pleased with the amount of marijuana and threatened to go to the police, presumably about Schmidt's grow operation.

¶ 14. D. R. thought Stephanie and Schmidt came to his house the Monday night before the murders, but he was not certain because he could not see the faces of the two individuals. D. R. testified his mother and Marsh were drinking and fighting that evening, and he went to bed. D. R. woke up sometime between 11:00 and 11:30 p.m. and went to the bathroom. D. R. saw a man and woman sitting on the couch and heard them arguing with his mother about money and marijuana. D. R. went back to bed, but he was curious about who was at the house and looked out the window. He saw a green truck that looked like Schmidt's in the driveway. The man and woman were gone when D. R. awoke at 3:30 a.m.

¶ 15. Defense counsel cross-examined D. R. using his prior statements made to the police. D. R. testified at trial that he recognized the man's and woman's voices, but he had previously told police he did not recognize them. D. R. also told police he had heard after the murders that Marsh called a friend, Tia Hale, on the evening of May 18th, and that Hale heard two people in the background during their conversation. During the same interview with police,

150

D. R. did not say he had actually seen the two people. D. R. could not recall at trial whether he told police during an interview in June 2009 that he had heard arguing in the house on the 18th, and he did not believe he said anything at that time about the loan and marijuana. Defense counsel also questioned D. R. regarding his earlier recollections about the vehicle he testified that he had seen and that matched the description of Schmidt's truck.

¶ 16. The jury found Schmidt guilty on both counts of intentional homicide. Schmidt was given two consecutive life sentences. Schmidt filed a post-conviction motion seeking a new trial, which the circuit court denied. Further facts and trial testimony will be set forth as necessary in the remainder of this opinion.

## DISCUSSION

¶ 17. Schmidt raises three issues on appeal. First, he claims the evidence presented at his trial was insufficient to convict him of killing Marsh. Second, he claims his statement to Stephanie that he would "like to shoot [Rose]" was inadmissible as a privileged private communication to a spouse under Wis. Stat. § 905.05(1). Finally, Schmidt argues the circuit court erroneously prevented him from presenting expert testimony from a child psychologist regarding influences that could affect a child's memory; Schmidt claims the exclusion of this testimony violated his constitutional right to present a defense. We reject each of these arguments.

151

*I. The evidence was sufficient to convict Schmidt of Marsh's murder.*

¶ 18. The standard for reviewing the sufficiency of the evidence to support a conviction is the same in either a direct or circumstantial evidence case. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). Under that standard, this court will not reverse a conviction "unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Id.* This court will "only substitute its judgment for that of the trier of fact when the fact finder relied upon evidence that was inherently or patently incredible— that kind of evidence which conflicts with the laws of nature or with fully-established or conceded facts." *State v. Tarantino*, 157 Wis. 2d 199, 218, 458 N.W.2d 582 (Ct. App. 1990) (citing *State v. Daniels*, 117 Wis. 2d 9, 17, 343 N.W.2d 411 (Ct. App. 1983)). If there is any possibility the trier of fact could have drawn the appropriate inferences from the evidence to find the requisite guilt, an appellate court may not overturn the verdict. *Poellinger*, 153 Wis. 2d at 507.

¶ 19. As a preliminary matter, Schmidt does not challenge the sufficiency of the evidence to convict him of killing Rose. As a result, Schmidt does not challenge that the jury could have found him guilty of that crime based on the evidence adduced at trial. *See Techworks, LLC v. Willie*, 2009 WI App 101, ¶ 25, 318 Wis. 2d 488, 770 N.W.2d 727 (appellant forfeits all claims of error not specifically raised on appeal). Rather, Schmidt's

argument regarding the sufficiency of the evidence pertains only to Marsh's murder.

¶ 20. Schmidt cryptically argues Marsh is the "forgotten man in this case." He suggests the jury could not reasonably conclude from the evidence that Schmidt killed both victims, apparently arguing Marsh's killer is still unknown. He contrasts the testimony of the State's pathologist, who testified the "gaping nature of the wound" to Rose was "consistent with a shotgun firing pellets as opposed to something like a slug," with the testimony of the State's firearms expert, who stated he was certain the lead fragments he analyzed were "originally a slug."[2] Schmidt also highlights the State's firearms expert's testimony that it was impossible to determine whether a particular weapon fired the shotshell components he analyzed. Finally, Schmidt argues the modes of the crimes differed, insofar as Rose was shot at close range from the front while Marsh was shot multiple times in the back from a distance. The implication of these arguments is that the jury should have concluded the murders were committed separately by two individuals.

¶ 21. This type of argument ignores our standard of review, requires that this court substitute its judgment for that of the jury, and, given the trial record, strains credulity. Schmidt does not cite or discuss the elements of first-degree intentional homicide; as a result, he does not assert the evidence was insufficient

---

[2] On cross-examination, the pathologist testified that the size of one of the fragments recovered from Rose's body was consistent with both a grouping of pellets that stuck together and a fragment of a shotgun slug.

to establish any particular element.[3] Schmidt is simply arguing the jury should have come to a different conclusion regarding his culpability for Marsh's death based on the evidence. However, the evidence Schmidt cites is not even minimally exculpatory of him as to Marsh's murder. Even if it were, this court will not invade the jury's function to determine where the truth lies and the credibility of the witnesses at trial. *State v. Johnson*, 184 Wis. 2d 324, 346, 516 N.W.2d 463 (Ct. App. 1994).

¶ 22. The State's theory of the case was that Schmidt drove to Rose and Marsh's residence at approximately 9:30 a.m. using Stephanie's car. Schmidt confronted Rose about the affair, the loan, her threat of "payback" for his failure to make an adequate, in-kind payment in marijuana, and her intention to show Stephanie the journal chronicling their affair. When Schmidt and Rose failed to resolve these issues, Schmidt retrieved his 20–gauge shotgun from Stephanie's vehicle while Rose was on the phone with her mother. After the phone call ended, Schmidt walked into Marsh's bedroom and fired one shot into the sleeping man's upper back. Schmidt reloaded and proceeded to Rose's bedroom, where he shot her in the face. Schmidt then returned to Marsh's bedroom and fired two more shots into Marsh's back. The shootings occurred over the course of just a few minutes, leaving Schmidt enough time to return home by approximately 10:40 a.m.

¶ 23. The State presented a strong circumstantial case in support of its theory. We agree with the State's assertion that the evidence adduced at trial

---

[3] A person is guilty of first-degree intentional homicide if he or she "causes the death of another human being with intent to kill that person." *See* WIS. STAT. § 940.01(1).

showed Schmidt had "powerful motives, the specific intent, the means and the opportunity to commit these heinous crimes." The evidence adduced at trial, viewed in the light most favorable to the conviction, was sufficient for the jury to conclude beyond a reasonable doubt that Schmidt was guilty of both murders.

¶ 24. There was trial testimony directly establishing Schmidt's motive for killing Marsh. In addition to the evidence outlined earlier in this opinion, *see supra* ¶¶ 4–14, Schmidt's mother, Mary Weisnicht, told her co-worker, Lisa Brennen, that Schmidt was "sick of the fact that [Marsh] . . . was meddling in . . . this affair" and "was tired of [Marsh] always being in there because [Marsh] didn't agree with the fact that they were having this affair and he was constantly getting in [Rose's] business."[4] According to Brennen, Weisnicht said Marsh had caused "considerable problems" for Schmidt.

¶ 25. Beyond this, if Schmidt killed Rose, as the jury found, the jury could reasonably infer Schmidt wanted to kill Marsh to eliminate a potential witness to the crime. Therefore, a review of all motive evidence at trial, including that pertaining to Rose, is germane to Schmidt's appellate argument. This evidence pertained to Schmidt's affair with Rose, the circumstances surrounding the loan between the two, and Rose's threat to show Stephanie the journal.

¶ 26. Stephanie provided substantial testimony regarding the conflicts caused by the affair. She stated

---

[4] Schmidt states this testimony was hearsay. Schmidt did interpose a hearsay objection at trial. He ultimately withdrew this objection, agreeing that the testimony was admissible as a prior inconsistent statement by Schmidt's mother, who denied at trial that she made the statement to Brennen. *See* WIS. STAT. § 908.01(4)(a).

it was a "trying time" for her and Schmidt, but they were attempting to mend their marriage. Stephanie testified Rose was making it more difficult to do that because Rose would send "[r]andom text messages" and, without solicitation, tell Stephanie details about the affair. According to Stephanie, Rose disclosed that she and Schmidt had sex on Stephanie and Schmidt's bed. Stephanie confronted Schmidt, and he then burned the mattress.

¶ 27. There was also considerable testimony that Rose's loan to Schmidt was a source of friction, particularly on the night prior to the murders. Schmidt's uncle, Keith, testified that Stephanie told him Rose was demanding payment of the loan in full after she discovered Schmidt had admitted the affair to Stephanie. Tia Hale testified that she received a call from Marsh around 11:00 on Monday night. Marsh told Hale there was a male and female in his and Rose's house.[5] Hale testified Marsh "didn't like them," and he was "very upset" and "crying" and wanted to leave. Hale heard a female voice in the background telling Rose to "shut up" and someone talking about money. Larry, Marsh's twin brother, testified that he received calls from both Rose and Marsh on Monday night, and Rose told him there had been a fight. The jury could reasonably infer Schmidt and Stephanie confronted Rose about the affair and the loan on the night before Rose and Marsh were killed.

¶ 28. There was also evidence Schmidt was displeased with Rose's decision to keep a journal and her willingness to share with Stephanie the writings regarding their affair. Keith testified he spoke with

[5] Hale could not remember the names of the individuals Marsh gave her. Hale testified the male had a short name, "and the lady's name was kind of long, a longer name."

Schmidt prior to the murders, at which time Schmidt revealed he was angry Rose had kept a journal chronicling the affair. When Marsh and Rose's mother, Donna Marsh, went through Rose's journals after her death, Donna found no journals discussing the affair with Schmidt. Police did not locate any such journals either. The jury could reasonably infer Schmidt had committed the murders, in part, to keep Stephanie from discovering the contents of the journal regarding his affair with Rose.

¶ 29. The State elicited testimony from an investigating agent employed by the Wisconsin Department of Justice. He testified the homicides "seemed to have been done with a purpose." There was no evidence suggesting a burglary or robbery and no signs of forced entry. As a result, the agent believed the crimes were committed by an acquaintance of at least one of the victims. In addition, Lisa Brennen testified that when she spoke with Weisnicht two days after the homicides, Weisnicht was visibly upset, and after they discussed the affair, Weisnicht said Schmidt had done "the worst of the worst."

¶ 30. Schmidt also does not dispute that if he had the opportunity and means to kill Rose, he necessarily also had the opportunity and means to kill Marsh.[6] There was evidence supporting the State's theory that Schmidt had engaged in the course of conduct constituting the offenses between 9:30 and 10:40 a.m. on

---

[6] Moreover, the State's firearms expert stated he had no reason to believe the shotshell components recovered from the crime scene had different manufacturers. There was no variation in the color or materials of the components, although he conceded different manufacturers could use the same components.

that Tuesday, killing Rose and Marsh using a 20–guage shotgun that he had destroyed after the crimes.

¶ 31. Special agent Bradley Kust testified he was able to drive from Rose and Marsh's residence to Schmidt's residence, observing all posted speed limits and traffic signals, in twenty-one minutes. Donna testified she and Rose spoke by phone for seven minutes beginning at 10:12 a.m. on the morning of the murders. Donna was in the area and told Rose she might stop at the house. Rose responded, "Right now?" Donna testified she had heard Rose use this expression in the past and it meant Rose did not want her there because Rose was "probably doing something" or someone was at the house that Donna would not want to see. When Rose had used that expression in the past, Donna had driven by the house and seen one of Schmidt's vehicles parked there. Donna tried calling Rose again at approximately 10:45 a.m., but there was no answer. Schmidt's neighbor testified she saw Schmidt pull into his driveway at 10:37 a.m. on Tuesday morning.

¶ 32. Weisnicht testified Keith had given Schmidt a 20–gauge shotgun as a birthday present when Schmidt was a teenager. Keith confirmed this testimony and stated the gun reloaded "rather easily." The State's firearms expert testified a person could fire four shots from a single-shot, 20–gauge break-action shotgun in under a minute, "[c]ertainly less than two minutes."

¶ 33. Investigator Keith Johnson testified that following the murders, Schmidt claimed to have sold his shotgun seven years earlier, at the same time he sold a boat. Tom Neumann, who purchased the boat from Schmidt, testified he had never purchased or

received a shotgun from Schmidt. A friend who attended a party at Schmidt's house several months after the murders overheard a conversation in which Schmidt stated the gun would never be found because it was in pieces. Keith, Schmidt's uncle, testified that shortly after the murders, Weisnicht told him Schmidt had "gotten rid of the shotgun I gave to him, then she had stated that he had burned some items in the burn pit behind his home. She didn't know what was in there."

¶ 34. As set forth above, there was ample evidence from which a jury could reasonably infer that Schmidt committed both murders, not just Rose's. We cannot say, as a matter of law, that no reasonable trier of fact could have found Schmidt guilty of Marsh's murder based on the circumstantial evidence presented. *See Poellinger*, 153 Wis. 2d at 501.

*II. Schmidt waived the marital privilege as to his statement to Stephanie that he wanted to shoot Rose, then himself.*

■

¶ 35. Schmidt asserts his wife should not have been permitted to testify that on Friday, May 15, 2009—four days before the murders—Schmidt told her he wanted to "shoot [Rose], then myself." He asserts this statement was a privileged communication to a spouse under Wis. Stat. § 905.05(1). Schmidt also argues the privilege was not waived such that the statement would have been admissible.

■

¶ 36. A fundamental tenet of our legal system is that the public has a right to every person's evidence. *State v. Gilbert*, 109 Wis. 2d 501, 505, 326 N.W.2d 744

(1982). This principle is codified in WIS. STAT. § 905.01, which states that unless a statutory or constitutional provision requires otherwise, no person has the privilege to refuse to be a witness, refuse to disclose any matter, refuse to produce any object or writing, or prevent another from doing any of the foregoing. Privileges are therefore the exception, not the rule. *Gilbert*, 109 Wis. 2d at 507–08. Further, privileges created by statute "must be strictly construed," for they are in derogation of the search for the truth. *Shibilski v. St. Joseph's Hosp. of Marshfield, Inc.*, 83 Wis. 2d 459, 466, 266 N.W.2d 264 (1978) (citing *Davison v. St. Paul Fire & Marine Ins. Co.*, 75 Wis. 2d 190, 199, 248 N.W.2d 433 (1977)).

¶ 37. The marital privilege protects private communications between spouses. *See* WIS. STAT. § 905.05(1). The privilege may be invoked to prevent the person's spouse from testifying against the person regarding such communications made during the marriage. *Id.* However, "[a] communication between spouses is not 'private' where a third party has access to the same information." *Kain v. State*, 48 Wis. 2d 212, 216, 179 N.W.2d 777 (1970). One particular application of this broad rule is that the privilege is waived if its holder "voluntarily discloses or consents to disclosure of any significant part of the matter or communication." WIS. STAT. § 905.11.

¶ 38. The State, anticipating a challenge to the admissibility of certain portions of Stephanie's testimony, filed a pretrial motion to admit Stephanie's statements regarding her conversations with Schmidt. The motion grouped Schmidt's statements to Stephanie in four categories: (1) Schmidt's comment about his desire to kill Rose and then himself; (2) Schmidt's

160

remarks about his affair with Rose and his desire to mend his marriage with Stephanie; (3) Schmidt's statements regarding his whereabouts on the morning of the homicides; and (4) Schmidt's remarks about disposing of his shotgun. The State argued Schmidt had waived any marital privilege with respect to these statements by voluntarily disclosing the substance of the communications to police during multiple interviews.

¶ 39. The defense stipulated that the privilege had been waived as to all statements sought to be admitted except for Schmidt's remark about killing Rose and then himself. As to that statement, Schmidt conceded he told authorities he had mentioned killing himself to Stephanie, but he denied saying anything to her about wanting to kill Rose.[7] Accordingly, Schmidt argued any testimony regarding the latter portion of the statement remained privileged and protected under Wis. Stat. § 905.05(1).

¶ 40. The circuit court concluded Schmidt had waived the marital privilege by disclosing to police a significant part of his communication to his wife. Specifically, the court determined Schmidt destroyed

---

[7] To be precise, when law enforcement interviewed Schmidt, he initially denied making any remarks to Stephanie about wanting to harm himself or anyone else. However, when an officer asked Schmidt directly whether he had made a comment prior to the murders about shooting Rose and then himself, Schmidt stated: "Maybe myself I guess, possibly." Schmidt continued: "If I may, if I, if I may have said it, it may be myself cuz I . . . think I told her something like ahh, well I if at least did myself you wouldn't have to look at me see the thoughts, I guess." The officer then attempted to clarify Schmidt's statement and determine whether Schmidt was denying that he said anything about taking Rose's life. Schmidt stated he could not recall saying anything about taking Rose's life, but he thought if he killed himself Stephanie "wouldn't have to look at [him] and see the pain and agony."

the marital privilege by confirming to police his statement that he wanted to kill himself. The circuit court acknowledged Schmidt did not disclose to law enforcement the contents of his entire statement to Stephanie and he specifically denied saying he wanted to kill Rose. However, the court concluded Schmidt's statement that he wanted to kill himself was a "significant part" of the statement to Stephanie that, when disclosed to a third party, resulted in waiver of the privilege as to the entire statement under Wis. Stat. § 905.11.

¶ 41. We review a circuit court's decision to admit or exclude evidence under an erroneous exercise of discretion standard. *Martindale v. Ripp*, 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698. Determining whether a person has voluntarily disclosed confidential communications to a third party typically requires a finding of the historical facts, *Dyson v. Hempe*, 140 Wis. 2d 792, 803, 413 N.W.2d 379 (Ct. App. 1987), which we review using the clearly erroneous standard, *State v. Johnson*, 2007 WI 32, ¶ 15, 299 Wis. 2d 675, 729 N.W.2d 182. However, where, as here, the facts are undisputed, the question of whether a person has waived a privilege is a question of law. *Johnson v. Rogers Mem'l Hosp., Inc.*, 2005 WI 114, ¶ 31, 283 Wis. 2d 384, 700 N.W.2d 27.

¶ 42. There is little case law directly addressing what constitutes a "significant part" of a matter or communication for purposes of Wis. Stat. § 905.11. Oftentimes, the privilege holder's statements or conduct will result in disclosure of the entire privileged matter or communication, such that there is no need to consider whether disclosure of a "significant part" has occurred. *See Umhoefer v. Police & Fire Comm'n of Mequon*, 2002 WI App 217, ¶ 20, 257 Wis. 2d 539, 652

N.W.2d 412 (assuming wife was holder of the marital privilege, she waived the privilege as to the entire matter by providing statements to the police).[8]

¶ 43. However, three Wisconsin cases that have addressed waiver—while not extensive in their discussion of the issue—guide us to our conclusion that Schmidt's admission to police when confronted with his wife's statement accomplished a waiver of the privilege as to the entire statement, not just the portion concerning Schmidt's suicidal ideations.[9] Those cases are: *State v. Johnson*, 133 Wis. 2d 207, 395 N.W.2d 176 (1986); *State v. Denis L.R.*, 2004 WI App 51, 270 Wis. 2d 663, 678 N.W.2d 326, *aff'd and remanded,* 2005 WI 110, 283 Wis. 2d 358, 699 N.W.2d 154; and *State v. Dalton*, 98 Wis. 2d 725, 298 N.W.2d 398 (Ct. App. 1980).

---

[8] The State contends this case is analogous to *Illinois v. Simpson*, 369 N.E.2d 1248 (Ill. 1977). However, *Simpson* is best viewed as an example of waiver of marital privilege as to an entire communication. There, police brought the defendant's wife into the room while questioning him and asked her to repeat the defendant's statement to her about committing a murder. *Id.* at 1250. Upon her doing so, the defendant replied, "Yes, but I told you later I was lying." *Id.* The Illinois Supreme Court concluded the defendant's response was clearly an affirmation to police that he had made all of the inculpatory remarks to his wife, which destroyed the privilege. *Id.* at 1252.

[9] In *Johnson v. Rogers Memorial Hospital, Inc.*, 2005 WI 114, 283 Wis. 2d 384, 700 N.W.2d 27, our supreme court failed to reach a consensus regarding whether a patient waived her therapist-patient privilege by disclosing a significant part of the confidential matter or communication, with three justices concluding she had and three concluding she had not. *See id.*, ¶ 3 n.1. Because there is no controlling opinion on that issue, that decision offers little guidance in applying WIS. STAT. § 905.11 here.

¶ 44. *Johnson* suggests a broad waiver rule. In *Johnson*, the defendant was convicted of first-degree murder and filed a postconviction motion alleging ineffective assistance of counsel. *Johnson*, 133 Wis. 2d at 210–11. His trial counsel had retained two experts, Dr. William Crowley and Kenneth Smail, Ph.D., to evaluate Johnson for purposes of a posttraumatic stress disorder defense. *Id.* at 211–12. Later, trial counsel requested that Crowley and Smail also evaluate Johnson's competency to stand trial. *Id.* at 212. Both experts reported having concerns about Johnson's competency, but, for conflict of interest reasons, both declined to offer a definitive opinion on the issue. *Id.* Counsel did not raise the issue with the circuit court, and both experts later authored letters that omitted any reference to their reservations about Johnson's competency. *Id.* at 212–14.

¶ 45. At the postconviction hearing regarding a claim of ineffective assistance of counsel, Johnson asserted the physician-patient privilege to prevent the experts from testifying. *Id.* at 215. However, he entered into evidence the expert reports questioning his competency. *Id.* at 225. The supreme court concluded that by "entering these letters into evidence, Johnson voluntarily disclosed a significant part of his confidential communication with Drs. Crowley and Smail." *Id.* at 225–26. As a result, Johnson waived the privilege with respect to *any* matter the experts could permissibly testify about at a nunc pro tunc competency hearing. *See id.*

¶ 46. Turning to *Denis L.R.*, the primary issue was whether a waiver of privilege must be done with intent. This court relied on the then-recent decision in *Sampson Children's Trust v. Sampson 1979 Trust*, 2003 WI App 141, 265 Wis. 2d 803, 667 N.W.2d 831,

which held that, in the context of the attorney-client privilege, waiver need not be accomplished knowingly.[10] *See Denis L.R.*, 270 Wis. 2d 663, ¶ 15 (citing *Sampson Children's Trust*, 265 Wis. 2d 803, ¶¶ 11, 17). *Denis L.R.* holds the same is also true of a WIS. STAT. § 905.11 waiver in the context of the counselor-patient privilege. *Denis L.R.*, 270 Wis. 2d 663, ¶ 16.

¶ 47. *Denis L.R.* also briefly addressed whether a child victim's mother, Dawn, waived the counselor-patient privilege on her daughter's behalf by disclosing to the child's great-grandmother certain information from the child's counseling sessions. The defendant was charged with repeated sexual assault of his granddaughter, and he asserted the victim told a family counselor that "nothing happened with her grandfather" and at other times claimed "something had happened only once." *Id.*, ¶¶ 2–3. The child's great-grandmother averred that Dawn had given her this information and had also said the child fabricated stories during the counseling sessions. *Id.*, ¶ 5. Dawn testified she "did not intend to waive any privilege but was simply discussing [the child victim's] well being with a trusted family member, her grandmother." *Id.*, ¶ 8. The circuit court concluded Dawn's disclosures to the grandmother were sufficient to waive the privilege as to any matter attendant to the issue of the purported sexual assaults. *Id.*, ¶ 9.

¶ 48. Dawn intervened in the criminal case and then appealed, asserting the disclosures were not a

---

[10] Following this court's decision in *State v. Denis L.R.*, 2004 WI App 51, 270 Wis. 2d 663, 678 N.W.2d 326, the supreme court reversed *Sampson Children's Trust v. Sampson 1979 Trust*, 2003 WI App 141, 265 Wis. 2d 803, 667 N.W.2d 831, on other grounds. *See Sampson Children's Trust v. Sampson 1979 Trust*, 2004 WI 57, 271 Wis. 2d 610, 679 N.W.2d 794.

significant part of the matter or communication for purposes of WIS. STAT. § 905.11. Dawn reasoned the victim was not seeing a counselor solely for the purpose of discussing the possible sexual assaults and the statements occurred during a thirty-second time period during two counseling sessions that each lasted over an hour. *Id.*, ¶¶ 10, 18. We rejected the contentions "that the significance of the statements are measured in light of the seconds they took to make or against the number of reasons for seeking counseling." *Id.*, ¶ 19. Dawn disclosed a significant part of the matter or communication vis-à–vis the child's statements to the counselor regarding the sexual assault because the possibility of the sexual assaults was one reason for seeking counseling and the child's statements related to whether the defendant did or did not sexually assault her. *Id.*, ¶ 19. We declined to address Dawn's assertion that the scope of the waiver should be limited to the exact words Dawn disclosed in her conversation with her grandmother because that argument was raised for the first time in Dawn's reply brief.[11] *Id.*, ¶ 19 n.4.

¶ 49. Finally, in *Dalton*, the defendant argued his wife should not have been permitted to testify that Dalton admitted to her that he had killed the victim

---

[11] Given this limitation, *Denis L.R.*, while discussing the waiver issue generally, is not highly relevant to the issue in this appeal, which concerns the scope of the waiver. Nonetheless, Schmidt questions the precedential value of this court's decision in *Denis L.R.*, noting that, on review, the supreme court elected not to address the waiver issue because it determined there was no privilege to begin with and affirmed on that basis. *See Denis L.R.*, 2005 WI 110, ¶ 7, 283 Wis. 2d 358, 699 N.W.2d 154. However, the general rule is that holdings of this court not specifically reversed on direct appeal to the supreme court retain precedential value. *Blum v. 1st Auto & Cas. Ins. Co.*, 2010 WI 78, ¶ 44, 326 Wis. 2d 729, 786 N.W.2d 78.

and buried the body near his residence. *Dalton*, 98 Wis. 2d at 732. We rejected this argument because Dalton made similar, though not identical, statements to police officers. *Id.* at 732–33. He told the officers that he choked and killed the victim, and he made "substantially the same" admission to a county jail inmate. *Id.* Dalton did not deny choking and killing the victim at trial, but instead offered testimony supporting his argument that the crime was second-degree murder because he did not intend to kill her. *Id.* at 733. We concluded that although Dalton's statement to his wife could give rise to a stronger inference of intent, "the inference to be drawn from the statement . . . is irrelevant to the question of waiver." *Id.* Dalton waived the marital privilege as to his entire statement to his wife by disclosing a significant part of the communication to third parties. *Id.* at 732.

¶ 50. Given the holdings in these cases, as well as the plain language of Wis. Stat. § 905.11, we conclude Schmidt waived the marital privilege with respect to his statement to Stephanie that he wanted to "shoot [Rose], then myself." Schmidt argues the circuit court should have found waiver only as to his statement that he wanted to kill himself, because that was the only portion of the communication to his wife that he subsequently confirmed making. However, the fact that Schmidt disclosed only a portion of the statement to a third party is not controlling; the defendants in *Johnson* and *Dalton* also disclosed only a portion of the total privileged matter deemed waived. The controlling principle of waiver is the privilege holder's voluntary disclosure of "*any* significant part" of the matter or communication. *See* § 905.11 (emphasis added).

¶ 51. Here, Schmidt undeniably disclosed to police a "significant part" of his communication to his

wife. When confronted with his wife's statement to authorities, Schmidt eventually—and voluntarily—agreed he told his wife he should shoot himself, but then maintained he never said he wanted to shoot Rose. However, the circumstances related to the affair and the couples' corresponding marital difficulties animated both aspects of Schmidt's statement to his wife. *See Denis L.R.*, 270 Wis. 2d 663, ¶ 19. Both parts of the communication involved him killing someone. Moreover, Schmidt's statement to his wife contained an important sequencing element. Schmidt wanted to first kill Rose, *then* kill himself. The two aspects of Schmidt's statement are not as easily separated as Schmidt suggests, such that Schmidt's admission to telling Stephanie he wanted to kill himself was a disclosure of a "significant part" of the total statement.

¶ 52. We reject Schmidt's contrary assertion that the "only significant part of the statement was . . . the incriminating part." There is no indication in the plain language of Wis. Stat. § 905.11 that the term "significant part" refers to the portion of the matter or communication that is most incriminating or otherwise harmful to the privilege holder. Rather, the statute uses the adjective "any" to precede "significant part," which evinces an intent to establish a broader rule regarding the parts of any particular matter or communication that could be "significant." It is clear from the terms of the statute that a matter or communication can have several "significant parts."

¶ 53. The significance of any portion of a communication is measured by the importance of its subject matter to the overall communication. This conclusion is clear not only as a matter of statutory interpretation, but also from *Dalton*, which teaches that any

inferences drawn from a particular statement—which in the present case include the degree of incrimination to the privilege holder—are "irrelevant to the question of waiver." *Dalton*, 98 Wis. 2d at 733. Here, there were only two "parts" to the communication at issue: Schmidt's statement that he wanted to shoot Rose, and his immediately subsequent statement that he wanted to then shoot himself. The latter statement was of sufficient importance to the overall communication, such that Schmidt's disclosure of it to police operated to waive the privilege as to the entire statement.[12]

*III. The circuit court properly excluded Schmidt's expert witness testimony, and the exclusion of this testimony did not violate Schmidt's constitutional right to present a defense.*

¶ 54. Schmidt argues the circuit court erroneously excluded expert psychiatric testimony from Dr. David Thompson regarding influences that could affect a child's memory. Schmidt claims the exclusion of this testimony violated his due process right to present a defense.

¶ 55. On August 29, 2013, Dr. Thompson provided defense counsel with a written report assessing "the ways in which the interviews and associated

---

[12] It is of course necessary to evaluate waiver under Wis. Stat. § 905.11 on a case-by-case basis. Accordingly, we do not opine on the application of the statute more broadly. The facts in this case regarding the marital privilege are limited to a single sentence the defendant uttered to his wife. This opinion should not be read, however, as requiring that a § 905.11 analysis must be done on a sentence-by-sentence basis in all cases.

factors may have either strengthened or weakened the reliability of the statements made by [D. R.]." Police interviewed D. R. on the day of the homicide and investigator Bradley Kust did so again on June 16, 2009, and on July 19, 2011. D. R. also gave testimony at the preliminary hearing on October 3, 2012. Thompson noted that D. R.'s statements regarding what he saw and heard the night before the murders had changed over time.

¶ 56. Thompson's report enumerated five factors he believed the jury should consider when "evaluating the accuracy of [D. R.]'s reports." Each of these factors related to what the defense categorized as "suggestive interviewing techniques." First, Thompson opined that external influences, including "negative stereotype induction," can affect a child's reports, and that there was the "potential" for negative stereotype induction in this case because there was conflict among Rose, Schmidt, and Stephanie.

¶ 57. Second, Thompson opined that inappropriate interviewing techniques can produce inaccurate reports; however, he acknowledged he was "unable to accurately assess the interview techniques used in the various interviews with [D. R.]" because he did not possess transcripts or recordings of those interviews. Nonetheless, Thompson stated he could determine from Kust's reports that

Kust was very much aware of proper child interviewing techniques as evidenced by his careful documentation of [D. R.]'s understanding of the truth versus a lie, his description of what appeared to be rapport building discussions with [D. R.] prior to asking more focused questions about the investigation, and the relative detail provided in his case report.

170

¶ 58. Third, Thompson wrote that interviewers occasionally engage in "confirmatory bias," which occurs when an interviewer has a preconceived notion of what may have occurred and "tends to pay attention to or assign greater weight to information or statements that confirm" that belief. The presence of this type of bias "can be inferred . . . where the interviewer misses opportunities to test alternative hypotheses (other explanations) for the statements made by the child being interviewed." Again, Thompson reported that he was unable to determine the extent to which interviewer bias may have influenced D. R.'s reports because he did not have a transcript or recording of the interviews.

¶ 59. Fourth, Thompson raised concerns about repeated interviewing. Thompson acknowledged "[t]he research on the use of repeated interviewing with children suggests that, under certain circumstances, it can be a useful tool and can result in additional accurate information from the interviewee." However, according to Thompson, this is not true when the repeated interviews involve a biased interviewer or inappropriate interviewing techniques. After reviewing the various statements D. R. made during the interviews, Thompson attributed some significance to the fact that some of the police interviews were initiated at the behest of family members, including D. R.'s grandmother. Thompson apparently did not reach any conclusion as to whether repeated interviewing affected D. R.'s statements. Instead, he stated it would be important for the jury to consider the "potential impact of . . . the either subtle or obvious pressure placed on [D. R.] by family members or others."

Thompson acknowledged there was "no documentation of the discussion between [D. R.] and his grandmother" or others.

¶ 60. Fifth, Thompson opined that source misattribution errors can affect the reliability of a child's statements. These errors occur when an individual, regardless of age, identifies the incorrect source of a memory, whether through the influence of another individual, leading questions, inappropriate interviewing techniques, or mistake. Thompson wrote that various circumstances in D. R.'s life, including his mother's drug use and frequent visits by unidentified individuals who argued with and threatened his mother, could possibility have resulted in a source misattribution error.

¶ 61. Prior to trial, the State filed a motion in limine seeking an order determining the admissibility of Dr. Thompson's testimony pursuant to Wis. Stat. § 907.02, which governs expert testimony. The State argued his testimony would not assist the trier of fact in understanding the evidence and was not based on a reliable application of the principles and methods Thompson discussed. The State noted that Thompson had neither listened to nor viewed the law enforcement interviews with D. R.; indeed, the interviews were apparently not recorded by any means.[13] As a result,

---

[13] Schmidt does not argue law enforcement's failure to record D. R.'s interviews warrants the admission of Dr. Thompson's testimony. Moreover, any such contention would lack arguable merit. In *State v. Jerrell C.J.*, 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110, our supreme court exercised its supervisory authority to require that all juvenile interrogations "be electronically recorded where feasible, and without exception when questioning occurs at a place of detention." *Id.*, ¶ 58. However, the court was careful to note it was not attempting to "regulate police practice," and it would not be

the State argued Thompson could not reliably apply the general principles he discussed to the facts of the present case. The State also noted that the research on which Thompson relied involved primarily children much younger than D. R.

¶ 62. Schmidt responded that Thompson's testimony was admissible given the bare fact that D. R.'s story had changed somewhat over the course of the various interviews, including D. R. recalling new information and spontaneously offering additional information on matters he had already spoken about with police. According to Schmidt, these "changes in [D. R.]'s story over time" were sufficient evidence that suggestive interview techniques were in fact applied in this case.

¶ 63. Schmidt acknowledged that any inconsistencies between D. R.'s trial testimony and his earlier statements would be explored in detail on cross-examination. However, Schmidt argued Dr. Thompson's testimony was "crucial for the jury to have an understanding about how and why [D. R.]'s story may have changed over time." Despite Thompson's stated inability to ascertain whether suggestive interviewing techniques had actually been used or affected D. R.'s memory, Schmidt claimed Thompson's testimony would "aid the jury in evaluating whether the interviewing techniques in this case were done properly, or improperly."

¶ 64. At a hearing on the State's motion, the State clarified it was not challenging Dr. Thompson's qualifications or the ability of experts under WIS. STAT.

"illegal for police to interrogate juveniles without a recording." *Id.*, ¶ 47. Rather, the *Jerrell C.J.* rule simply "render[s] the unrecorded interrogations and any resultant written confession inadmissible as evidence in court." *Id.*

§ 907.02 to testify in the area of suggestive interview techniques. Rather, the State argued Thompson, by his own admission, was unable to apply the research in that area to the facts of this case, which raised a relevancy issue. Upon questioning by the circuit court, defense counsel again conceded any inconsistencies between D. R.'s statements at trial and elsewhere—and the reasons for them—could be explored on cross-examination. The circuit court deferred ruling on the State's motion in limine until it could hear Thompson's testimony at a subsequent pretrial hearing.

¶ 65. At the pretrial evidentiary hearing, Dr. Thompson conceded that much of the research he relied upon dealt with children primarily between the ages of three and six, with some studies involving children up to age seven. Though certain principles were more applicable to older children than others, and Thompson testified the "child literature would generally apply to an 11 year old," Thompson conceded "[i]t's much harder to influence an older child's memory than it is for a very young child's memory." Thompson stated the factual basis for his testimony consisted of an unspecified letter, the criminal complaint, a "handful" of police reports, an investigation report, and the preliminary hearing transcript.

¶ 66. Defense counsel asked Dr. Thompson to explain how his testimony would aid the jury. Notably, Thompson acknowledged he could not offer an opinion that D. R.'s testimony or memory was in fact tainted by any of the suggestive interview techniques generally expounded upon in his report. Furthermore, he explained there could be perfectly innocent explanations for any discrepancies between D. R.'s various statements:

> More importantly, in this particular situation the jury needs to have some understanding of why it is that [D. R.]'s reports have kind of varied over time. Of course one explanation is that he remembered more and that he made those recollections independently, and he didn't have any kind of external interference with his memory or with his reports.
>
> Certainly another hypothesis . . . is that there were other things that went on that may have impacted his recollection, may have impacted his motivation to make statements, and may have resulted in inaccurate information on his part. But that's certainly something that the jury needs to know about so that they can make an informed decision.

Thompson acknowledged that, as a result of the lack of records surrounding D. R.'s interviews, the State's objection was "partially [correct] in that I can't say that something definitely happened or didn't happen in that interview." However, Thompson asserted he could testify as to the general research literature, and that he could attempt to "put that research in the context of the interview of [D. R.]." Thompson did not elaborate on this latter statement.

¶ 67. On cross-examination, the State elicited Thompson's concession that he never talked with D. R. and did not know if D. R. was susceptible to the suggestive interview techniques Thompson generally discussed. Thompson also again conceded he had no evidence that suggestive interview techniques were actually used with D. R.

¶ 68. The circuit court determined the defense's concerns regarding inconsistencies in D. R.'s statements were best addressed through cross-examination of D. R. at trial, rather than by introducing Dr. Thompson's testimony. The court recognized the police

should have recorded the interviews in some fashion, but it concluded their failure to do so did not "in and of itself show that there was an inappropriate interviewing technique" used. Further, the court observed Thompson had not articulated any factual basis to conclude D. R.'s statements or memory were tainted by external influences, interviewer bias, inappropriate repeated interviewing, or source misattribution errors. Accordingly, the court granted the State's motion in limine.

¶ 69. However, the circuit court also contemplated the possibility that Dr. Thompson's testimony might become admissible by virtue of other evidence introduced during the trial. The court stated that if the trial evidence revealed that any suggestive interview techniques had been applied to D. R., it would revisit its pretrial evidentiary ruling and permit Thompson to testify. During the trial, Schmidt never requested that the court revisit its ruling.

¶ 70. "The admissibility of expert opinion testimony lies in the discretion of the circuit court." *State v. St. George*, 2002 WI 50, ¶ 37, 252 Wis. 2d 499, 643 N.W.2d 777. A circuit court erroneously exercises its discretion if it fails to examine the relevant facts, applies the wrong legal standard, or fails to use a demonstrated rational process to reach a reasonable conclusion. *Brown Cty. v. Shannon R.*, 2005 WI 160, ¶ 37, 286 Wis. 2d 278, 706 N.W.2d 269. We decide any questions of law arising during our review of an exercise of discretion de novo. *St. George*, 252 Wis. 2d 499, ¶ 37.

¶ 71. Schmidt also filed a postconviction motion alleging the exclusion of Dr. Thompson's testimony

violated his constitutional right to present a defense. The circuit court denied this motion, again concluding Schmidt failed to establish the relevance of Thompson's testimony. The right to present a defense is grounded in the confrontation and compulsory process clauses of the Sixth Amendment to the United States Constitution and article I, section 7 of the Wisconsin Constitution. *State v. Miller*, 2002 WI App 197, ¶ 45, 257 Wis. 2d 124, 650 N.W.2d 850. The right is not absolute, however, and is limited to the presentation of "relevant evidence not substantially outweighed by its prejudicial effect." *St. George*, 252 Wis. 2d 499, ¶ 15 (quoting *State v. Pulizzano*, 155 Wis. 2d 633, 646, 456 N.W.2d 325 (1990)).

¶ 72. "Where the focus of the claim is on the constitutional right of a defendant to present a defense, the issue is one of constitutional fact." *Miller*, 257 Wis. 2d 124, ¶ 44. An issue of constitutional fact presents a mixed question of fact and law subject to a two-step standard of review. *State v. Martwick*, 2000 WI 5, ¶ 16, 231 Wis. 2d 801, 604 N.W.2d 552. We apply the clearly erroneous standard of review to a circuit court's findings of evidentiary or historical fact. *Id.*, ¶ 18. The application of constitutional principles to these facts presents a question of law. *Id.*, ¶¶ 17–18. If a defendant is denied his or her constitutional right to present a defense, the circuit court erroneously exercised its discretion to exclude expert witness testimony. *St. George*, 252 Wis. 2d 499, ¶ 49.

¶ 73. In *St. George*, our supreme court articulated a two-part inquiry encompassing both admissibility and constitutional issues associated with a defendant's proffered expert witness testimony. This two-

part test "enables a circuit court to determine the accused's interest in admitting the evidence." *Id.*, ¶ 53. It also permits the court to determine whether that evidence is "clearly central to the defense and the exclusion of the evidence is arbitrary and disproportionate to the purpose of the rule of exclusion, so that exclusion 'undermine[s] fundamental elements of the defendant's defense.' " *Id.* (quoting *United States v. Scheffer*, 523 U.S. 303, 315 (1998)) (alteration in *St. George*).

¶ 74. First, Schmidt must demonstrate that Dr. Thompson's testimony satisfied each of the following four requirements:

(1) The testimony of the expert witness met the Wis. Stat. § 907.02 standards governing the admission of expert testimony;

(2) The expert testimony was "clearly relevant to a material issue" in the case;

(3) The expert testimony was necessary to the defendant's case; and

(4) The probative value of the expert testimony outweighed its prejudicial effect.

*St. George*, 252 Wis. 2d 499, ¶ 54. If Schmidt satisfied these four requirements and thus established a constitutional right to present Thompson's expert testimony, we must then consider whether Schmidt's "right to present the proffered evidence is nonetheless outweighed by the State's compelling interest to exclude the evidence." *Id.*, ¶ 55.

¶ 75. We assume, without deciding, that Dr. Thompson's testimony satisfied the Wis. Stat. § 907.02 standards governing the admission of expert testimony. Although the State focuses on the requirements of § 907.02, its arguments are more material to the

relevance inquiry. The State notes Thompson "openly acknowledged the lack of any connection between his general opinions and the specific facts of this case." Thompson could not opine whether any of the suggestive interview techniques he discussed were actually used with D. R., nor could he conclude the changes in D. R.'s story over the course of several years were attributable to such techniques. There were no visual or audio recordings of the interviews for Thompson to review, no transcript of the interviews, and Thompson never met or spoke with D. R. At best, Thompson could testify generally as to the findings of the research regarding the suggestibility of children who were often much younger than D. R.

¶ 76. For these reasons, we conclude that even if Dr. Thompson's proposed testimony satisfied the requirements of WIS. STAT. § 907.02(1), the circuit court nonetheless properly excluded the testimony on relevance grounds.[14] Evidence is relevant if it has any

---

[14] WISCONSIN STAT. § 907.02(1) was amended in 2011 to adopt the expert witness standard articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). *See State v. Giese,* 2014 WI App 92, ¶ 17, 356 Wis. 2d 796, 854 N.W.2d 687, *review denied,* 2015 WI 24, 862 N.W.2d 602. Under these standards, a qualified expert witness may testify "in the form of an opinion or otherwise" if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," and if the expert's testimony is "based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case." Subsec. 907.02(1). We note that *State v. St. George,* 2002 WI 50, 252 Wis. 2d 499, 643 N.W.2d 777, was decided prior to § 907.02(1)'s amendment.

There is no dispute in this case that Dr. Thompson was sufficiently qualified to testify regarding suggestive interview techniques or that such testimony involved "scientific, techni-

tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable. WIS. STAT. § 904.01. Schmidt argues Thompson's testimony was relevant because D. R.'s credibility was an issue in the case.

¶ 77. While D. R.'s credibility was at issue, we disagree that Dr. Thompson's testimony was relevant to D. R.'s credibility if there was no factual basis on which to relate Thompson's expert opinions to D. R.'s testimony as a fact witness. Indeed, Schmidt's argument fundamentally begs the question of relevance because, by Thompson's own admission, his testimony was relevant to D. R.'s credibility only if suggestive interview techniques were, in fact, used with D. R.—a matter on which Thompson could not testify. Contrary

---

cal, or other specialized knowledge." However, we, like the State, have reservations regarding whether Thompson was able to apply the principles and methods reliably to the facts of this case, and whether his testimony would have assisted the jury in understanding the evidence or determining a fact at issue absent such a connection to the facts. Contrary to Schmidt's assertion, this is not merely a question of whether exposition testimony—essentially a lecture—is permitted under the new rule; it likely is. *See* Daniel D. Blinka, *The* Daubert *Standard in Wisconsin: A Primer*, WISCONSIN LAWYER, Mar. 2011, at 18 (citing FED. R. EVID. 702 advisory committee's note to 2000 amendment) (exposition testimony admissible as "other" testimony if it assists the trier of fact); *see also Hampton v. State*, 92 Wis. 2d 450, 458–59, 285 N.W.2d 868 (1979). Rather, Schmidt's argument for the relevance of Thompson's testimony was that it would bring into question the reliability of D. R.'s testimony, not that it would educate the jury about a general scientific phenomenon, such as thermodynamics or blood clotting. *Cf.* Blinka, *supra,* at 18.

Ultimately, it is not necessary to decide whether Dr. Thompson's testimony satisfied WIS. STAT. § 907.02. Like the circuit court, we conclude Thompson's testimony failed to satisfy the remaining *St. George* factors.

180

to Schmidt's argument, it is clear Thompson could not provide a foundation for his own testimony. Moreover, Thompson repeatedly disclaimed any intention or ability to offer an opinion on D. R.'s credibility and, indeed, such testimony would have been prohibited by *State v. Haseltine*, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984) ("No witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth.").

¶ 78. While it is true that "the ability of a witness to accurately perceive persons, objects and events, and then to correctly recall and relate those perceptions at trial[,] is relevant to the credibility of that witness' testimony," *Hampton v. State*, 92 Wis. 2d 450, 455–56, 285 N.W.2d 868 (1979), here Thompson's expert testimony did not address whether D. R. correctly perceived or recalled the events on the night prior to the murders. Though Thompson purported to offer insight gleaned through his knowledge of various studies concerning how certain interview techniques and external factors can subtly influence a child's beliefs, he could only testify about such matters at a high level of generality and could not tie these concepts in any meaningful way to the particular circumstances surrounding D. R.'s statements to police.

¶ 79. Moreover, the particular facts of this case upon which Dr. Thompson did rely do not support a conclusion that suggestive interview techniques affected D. R.'s memory or testimony. Thompson readily conceded that investigator Kust appeared to be well-versed in appropriate child interview techniques. Moreover, Thompson agreed that repeated interviewing of the same child is not per se improper. He also

ultimately conceded at the motion hearing that there was no indication that other persons had prompted D. R.'s spontaneous disclosures of additional information.

¶ 80. More generally, Thompson did not cite any facts suggesting D. R.'s memory or testimony had been affected by external influences, inappropriate interviewing techniques, confirmatory bias on the part of his interviewers, or source misattribution. And, again, Thompson could not offer the opinion that any inconsistencies or omissions in D. R.'s recollections were attributable to the phenomena Thompson discussed, or that any suggestive interview techniques had in fact occurred.

¶ 81. In support of his admissibility argument, Schmidt relies on the bare fact that D. R.'s recollection had changed during the course of several years and several interviews. A jury is permitted to draw reasonable inferences from the evidence, *see State v. Hauk*, 2002 WI App 226, ¶ 12, 257 Wis. 2d 579, 652 N.W.2d 393, and, in this case, Schmidt argues one inference the jury could draw from D. R.'s changing stories is that he was subjected to suggestive interview techniques. Without any other evidence of these techniques being applied, we are skeptical that such an inference would be reasonable. Perhaps more important, because Dr. Thompson would not opine that any suggestive interview techniques were actually used with D. R., the relevance of Thompson's testimony is contingent upon the jury drawing that inference independent of his testimony. Schmidt's argument fails to acknowledge this limitation of Thompson's testimony.

¶ 82. *St. George* is instructive as to the threshold relevancy issue. In that case, the defendant was charged with sexual assault of a child based on the victim's reports to various individuals of the defendant

fondling her. *St. George*, 252 Wis. 2d 499, ¶ 8. At trial, the victim denied both the improper touching and making some of the reports. *Id.*, ¶ 9. The defendant sought to admit testimony from his expert, Dr. Stonefield, to rebut evidence the State proffered that the vast majority of child victims who recant later reaffirm the charges of sexual abuse and that the child interview technique used by one of the State's experts was reliable. *Id.*, ¶¶ 31–32. Stonefield would have testified it was not possible to assign a specific level of scientific probability to the victim's truthfulness and the interview technique the State's expert used did not guarantee reliability. *Id.*, ¶¶ 34–35.

¶ 83. Unlike *St. George*, this case does not turn on the defendant's and alleged victim's respective credibility. In *St. George*, both the defendant and the victim took the stand and denied the alleged sexual contact. *Id.*, ¶ 60. The State then presented the victim's out-of-court statements to support the charges, and it was required to explain why the victim's account had changed. *Id.* Conversely, the defendant needed to explain why the defendant's and the victim's trial testimonies were more reliable than the victim's earlier statements. *Id.*, ¶ 61. Thus, the court concluded Dr. Stonefield's testimony was "relevant to a material issue in this case: the credibility of [the victim] and the defendant," because Stonefield's testimony was designed to undermine the State's expert witnesses.

¶ 84. Here, D. R.'s credibility was not the centerpiece of the State's case. D. R. was not an eyewitness to the crime and his testimony, while significant, was only material to aid in establishing Schmidt's motive. Because Dr. Thompson could not offer any conclusion as to whether D. R.'s testimony had been influenced by suggestive interview techniques, Thompson's testi-

183

mony would not have made it less probable that D. R.'s account at trial was accurate. Accordingly, Thompson's testimony did not satisfy the definition of relevance in WIS. STAT. § 904.01.

¶ 85. Moreover, *St. George* does not support Schmidt's claim that Thompson's testimony was necessary to his case. In *St. George*, Dr. Stonefield's testimony was clearly necessary because the "case was shaping up as a battle of experts," and the defendant had none. *Id.*, ¶ 63. Here, Thompson's testimony was not necessary to rebut any expert testimony offered by the State concerning the reliability of D. R.'s trial testimony. In addition, Thompson's testimony would not necessarily have undermined D. R.'s credibility, because Thompson stated he could not testify that D. R. had in fact been subjected to suggestive interview techniques. As the State points out, "[e]stablishing . . . *why* [D. R.]'s statements were inconsistent was not nearly as important as establishing, as Schmidt did, that those statements *were* inconsistent." Through cross-examination, Schmidt was able to effectively challenge D. R.'s testimony and recollection without resorting to speculation that the police had subjected D. R. to improper interview techniques or that other external factors had affected D. R.'s memory.

¶ 86. Even if Dr. Thompson's testimony had a razor-thin degree of relevancy based on the mere possibility that D. R. had been subjected to suggestive interview techniques, the evidence would have been properly excluded under WIS. STAT. § 904.03. Section 904.03 echoes the fourth *St. George* factor and provides, in part, that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." What minimal probative value Thompson's testimony may have had re-

garding D. R.'s credibility was easily outweighed by the very real potential that Thompson's testimony would mislead or confuse the jury by requiring them to speculate about what had occurred during the police interviews and elsewhere. In particular, if Thompson's testimony were admitted into evidence, it is entirely probable the jury would conclude, based solely on the fact he *was* testifying, that suggestive interview techniques had been used with D. R. despite the absence of any evidence to that effect.

¶ 87. Citing *Hampton*, Schmidt also argues the circuit court should have permitted Dr. Thompson's testimony regarding the general principles of suggestive interview techniques, leaving to the jury the task of applying those principles to the specific facts of this case. *See Hampton*, 92 Wis. 2d at 459. However, the expert testimony sought to be admitted in *Hampton* related to the "fallibility of human perception in general," a problem endemic to all eyewitnesses. *See id.* at 461. Instead, Thompson's testimony related to very specific events and interview techniques that, according to certain studies, could affect a child's perceptions and beliefs. It was directed at a single, particular fact witness, D. R. As we have explained, the jury could not have drawn the requisite inference regarding D. R.'s credibility from Thompson's testimony alone without resorting to rank speculation.

¶ 88. Finally, the circuit court gave Schmidt the opportunity to establish a nexus between Dr. Thompson's testimony and the evidence adduced at trial, in which case the court agreed to revisit its pretrial admissibility ruling. On appeal, Schmidt does not argue the circuit court should have revisited its pretrial ruling based on any testimony elicited at trial. Indeed, at trial, Schmidt appears not to have at-

tempted to establish a foundation for Thompson's testimony, and he did not request that the court reconsider its pretrial ruling based upon the evidence submitted. In short, the record and arguments on appeal reflect Schmidt's failure to avail himself of the circuit court's invitation to bridge the relevance gap so as to permit Thompson's testimony.

*By the Court.*—Judgment and order affirmed.