COURT OF APPEALS
DECISION
DATED AND FILED

November 2, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1051-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2011CF5030

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

BRUCE TERRELL DAVIS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JEAN A. DiMOTTO and MICHELLE ACKERMAN HAVAS, Judges. *Affirmed*.

Before Donald, P.J., Dugan and White, JJ.

Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).

¶1     PER CURIAM.  Bruce Terrell Davis appeals from a judgment of conviction for one count of robbery and three counts of burglary, and an order of the circuit court denying his motion for postconviction relief.  On appeal, he argues that the circuit court's credibility determinations from the hearing on his postconviction motion were clearly erroneous and, thus, the circuit court erred in denying his motion.  He also argues that the circuit court erred when it found that his right to present a defense was not violated when the trial court removed photos from the manila folders used for conducting the photo array that Oliver[1] viewed, and sent the loose photos to the jury room during deliberations.

¶2     We conclude that the circuit court's credibility determinations are not clearly erroneous.  Thus, we uphold the circuit court's denial of Davis's motion.  We further conclude that the trial court's decision to provide the jury with loose photographs did not violate Davis's right to present a defense because the manila folders accompanying those photos were not essential to his defense.  Accordingly, we affirm.

**BACKGROUND**

¶3     Davis was arrested on October 3, 2011, and then charged on October 19, 2011, with one count of robbery (use of force) and three counts of burglary (building or dwelling) for break-ins that occurred in three homes in August and September 2011 in the residential area surrounding UW-Milwaukee's

---

[1] We use pseudonyms to refer to the victims in this case for ease of reference and to protect the victims' identities.

campus.[2]  During two of the break-ins, a man entered a residence and took a valuable item, such as a laptop, that was left out in the open, and the occupants engaged the man in a physical altercation in an attempt to retrieve the item.  In the third break-in, the occupant heard noises coming from her living room, and when she realized it was a stranger, she quietly went to her bedroom and closed the door.  She waited until she no longer heard any noises, left her bedroom, and found that her fiancé's computer and game console were missing.

¶4      Over the course of the pretrial proceedings, Davis filed several motions to suppress evidence.  As relevant here, Davis filed one motion to suppress evidence on April 13, 2012, and another motion on September 26, 2012. In each motion, Davis argued that the police had no specific or articulable facts that amounted to reasonable suspicion of criminal activity to be able to stop Davis on October 3, 2011.  In particular, Davis argued that knocking on a front door, as the officers alleged he was doing, was not suspicious criminal activity for which the police would be able to approach Davis, guns drawn, and order Davis to the ground.[3]      Thus, he argued that the evidence—consisting mainly of his identification and fingerprints—should be suppressed.

¶5      Davis additionally filed a motion to suppress the identification that one of the victims (Margaret) made during a photo array because, as Davis argued, the photo array was impermissibly suggestive and its admission violated his right

---

[2] An additional misdemeanor charge of criminal trespass to a dwelling, as a repeater, for a similar incident from September 29, 2011, was joined with these charges for purposes of trial. This charge also added a fourth victim, Charles.

[3] As noted below, the officers testified at the suppression hearing that they did not approach Davis with guns drawn and did not order Davis to the ground.

to due process. As Davis contended in his motion, Margaret identified photo No. 3 during the photo array, but Davis's photo was listed as photo No. 4 on the photo lineup sheet. Thus, Davis argued that the identification should be suppressed because of the likelihood that Davis was misidentified.

¶6 The trial court held an evidentiary hearing on November 27, 2012, to address Davis's motions to suppress evidence and suppress Margaret's identification.[4] Officer Michael Murphy and Davis testified at the portion of the hearing addressing Davis's motion to suppress evidence, and Officer Gary Cherone testified at the portion of the hearing addressing Davis's motion to suppress Margaret's identification.[5]

¶7 At the hearing, Officer Murphy testified that he had investigated a complaint of an entry into a residence at the end of September 2011 and that the occupant, Charles, provided a description of the suspect and a description of what happened when the suspect entered the house.[6] Just days later, Officer Murphy

---

[4] The Honorable Jean A. DiMotto presided over the suppression hearing and Davis's trial and sentencing. The Honorable Michelle Ackerman Havas presided over the hearing addressing Davis's postconviction motion and entered the orders denying Davis's postconviction motions. We refer to Judge DiMotto as the trial court and Judge Havas as the circuit court.

[5] Margaret was unavailable to provide testimony at the hearing. The trial court took the testimony of Officer Cherone and left the motion undecided until trial when it was able to take Margaret's testimony.

[6] Officer Murphy testified that Charles described "a black male, approximately 6'1["] in height, 170 pounds, wearing a Minnesota Gophers purple lettermen style jacket" and "carrying a purple Minnesota Vikings umbrella." On cross-examination, Officer Murphy further provided that Charles described being asleep on his couch when "a man comes in" and "asks for someone." Officer Murphy further testified that Charles described that he responded that "no such person lives here" and the man left. The record did not indicate what Davis was wearing or carrying on the day of his arrest, but the trial court dismissed any potential discrepancy in apparel saying that it "wouldn't expect" the suspect would be wearing "the same clothing or even carrying the same umbrella" a few days later.

was on patrol in the same general area of where the break-ins had occurred when he "notice[d] an individual matching the description of what had been occurring" on the front porch of a house knocking on the door. Officer Murphy approached the individual to conduct a field interview and asked the individual "his name and purpose of being at the location." Officer Murphy testified "there was also a portion of that interview that [the individual] claimed that he was there to speak to a certain individual at the house," but when Officer Murphy sought to confirm that explanation, the occupants of the house denied knowing Davis or anyone Davis claimed to be looking for.

¶8 Officer Murphy learned Davis's identity when Davis provided a photo I.D., and when Murphy ran Davis's I.D., Murphy additionally learned that there was an outstanding warrant for Davis's arrest. Murphy then arrested Davis on the outstanding warrant. Officer Murphy denied that he ever laid his hands on Davis before the arrest or drew his weapon. Officer Murphy acknowledged that "other officers responded almost simultaneous to me because they were also in the area canvassing for the potential burglar." When he was recalled, Officer Murphy identified Officer James Hernandez as one of the other officers on the scene, and he described that Officer Hernandez arrived "simultaneously" to him. Officer Murphy testified that he never saw Officer Hernandez draw his gun.

¶9 In contrast, Davis testified that he was looking for his lost cell phone that day and he was knocking on the door of the house where he thought he might have left it. He testified that he was walking down the steps of the porch when Officer Hernandez approached him with his gun drawn and ordered Davis to get to the ground. Davis said that he complied and described that Officer Hernandez put his foot on his back and that "Officer Murphy jumped out of his squad car and came up to the scene" when Officer Hernandez was just starting to ask Davis what

Davis was doing there. Davis described that Officer Murphy took Davis's wallet out of his pocket and obtained Davis's I.D., while Officer Hernandez had Davis pinned on the ground.

¶10 The trial court assessed the credibility of the witnesses in making its ruling and found that "[t]here are some difficulties with [] Davis's testimony." In particular, the trial court found that Davis was "internally inconsistent with his own testimony" and Davis's testimony "didn't make sense" and "didn't seem reasonable." The trial court also found that it did not find Davis to be credible when he testified that he was looking for his cell phone that day because "[h]ow many people think they left their cell phone somewhere, and have an idea that maybe, this is where it was at this particular house?"

¶11 At the second part of the hearing, Officer Cherone testified about the photo array. Officer Cherone testified that he conducted the photo array using six photos—one photo of the suspect and five photos of individuals with a similar appearance—that were placed in individual manila folders and then shuffled so he would not know the order. He further testified that he had a photo lineup sheet for his own use in conducting the photo array that listed the six photos placed in the folders, along with the corresponding information on the subjects in the photo. Officer Cherone testified that the photos in the manila folders were shown to Margaret and the photo lineup sheet was not. He further stated that Margaret

identified Davis's photo, which was placed in the third manila folder, but that Davis's photo was placed fourth on the photo lineup sheet.[7]

¶12 The trial court took testimony from Margaret prior to the trial. In her testimony, she confirmed the process used for the photo array consisted of photos in manila folders, and she testified that she was 100% sure of her identification. She also testified that this was not the first photo array that she saw in connection with this case, but she did not identify anyone in the first photo array. The trial court found that it was "satisfied from the full hearing, that is from the testimony of Officer Cherone, and [Margaret] that the photo that was the one chosen, if you will, by [Margaret] was in fact the photo of the Defendant."

¶13 The case proceeded to a jury trial. The four victims testified at trial regarding the break-ins that occurred in August and September 2011, and several officers testified regarding the police investigation. Davis did not testify.

¶14 The victims and the officers testified regarding what occurred during the break-ins, the investigation into the break-ins, including photo arrays and interviews conducted with the victims, and the fingerprint analyses done on prints recovered from the sites of the break-ins that were later determined to match Davis's prints. As particularly relevant here, the photo arrays conducted with Charles, Margaret, and Oliver were all introduced into evidence and testimony

---

[7] Later at trial, Officer Cherone testified that he knew that Margaret identified Davis's photo because he took the photos, while still in their manila folders and in the order shown to Margaret, "back to the district to complete [his] supplemental report" and matched the photos in the manila folders to the photos on the lineup sheet. Officer Cherone testified that Margaret identified the photo in the third manila folder and he matched the photo in the third manila folder to Davis's photo, which was number four on the lineup sheet. He acknowledged on cross-examination, though, that he did not have Margaret mark the photo, such as by signing or initialing the back of the photo, in order to conclusively determine which photo Margaret chose.

from the victims and the officers was taken regarding how each photo array was conducted and that Davis was identified by each victim during the photo arrays. Margaret testified that she was 100% sure of the identification that she made during her photo array, and Oliver testified that he was only 60% sure of the identification that he made during his photo array. As to the photo arrays themselves, two of the photo arrays introduced into evidence during the trial, those conducted with Charles and Oliver, included the manila folders used for conducting the arrays, but for some unidentified reason the photo array conducted with Margaret did not include the manila folders as part of the trial exhibits.

¶15 During the deliberations, the jury requested to see the photo arrays conducted with Oliver and Margaret. After consulting the parties over what to send to the jury room, the trial court removed the photos in the photo array that Oliver viewed from the folders and sent the loose photos from the array to the jury in the order shown to Oliver during the array. The trial court did this so that both photo arrays would be sent to the jury in the same form, without manila folders.

¶16 Davis was ultimately convicted as charged and sentenced to a total of twenty-one years and six months of imprisonment, bifurcated as seventeen years of initial confinement and four years and six months of extended supervision.

¶17 Davis filed his first postconviction motion in which he alleged that he was entitled to a new trial because the State had committed a ***Brady***[8] violation for failing to disclose a report about his arrest that was prepared by Officer

---

[8] ***Brady v. Maryland***, 373 U.S. 83 (1963).

Hernandez,[9] that Officer Murphy committed perjury at the suppression hearing, that he received ineffective assistance of counsel, and that the trial court violated his right to due process by not allowing him to show the jury "the deficiencies" in the photo array that Margaret viewed. The circuit court granted Davis an evidentiary hearing to address whether there was a ***Brady*** violation, whether Officer Murphy committed perjury, and whether Davis received ineffective assistance of counsel. Officer Hernandez, Officer Murphy, and Davis all testified at the hearing.

¶18 Officer Hernandez testified that, on the day Davis was arrested, he was on patrol as part of the police effort to look for "suspicious people that may have been responsible for a recent uptake in daytime burglaries." During his patrol, he noticed a male individual who met the general description of the suspect "walking down the porch" and "[h]e stopped abruptly, turned around, and went back to the door and knocked on it." Officer Hernandez testified that he continued to watch him and "[h]e came down the porch, across the street, went to a different house." Officer Hernandez was concerned by the individual's behavior and decided to approach the individual to conduct a field interview. Officer Hernandez testified that he "made the initial stop, but Officer Murphy arrived

---

[9] After he was convicted, Davis obtained a report prepared by Officer Hernandez about the arrest. According to Davis, this report conclusively establishes that Officer Hernandez, not Officer Murphy, was the first to approach Davis.

within seconds."[10]  He described the interaction as "relatively cordial" and denied that he used his firearm or laid his hands on Davis prior to Davis's arrest.

¶19    Officer Hernandez described that Davis explained what he was doing there by saying that he was looking for his friend, Kevin, but when Officer Hernandez asked follow up questions, Davis could not provide Kevin's last name or where Kevin lived.  Officer Hernandez said, "He explained to us that he was at Kevin's the previous night, playing poker; and he left his cell phone at the house. But he couldn't remember what the address was, so he was knocking on random doors, hoping to find Kevin."

¶20    Officer Murphy then testified that he was canvassing the area that day because "there had been multiple burglaries in that area."  He testified that he noticed Davis on the porch of a house and decided to talk to Davis.  He further testified that Officer Hernandez pulled up about the same time that he did, and they arrested Davis after learning that there was a warrant out for Davis's arrest. On cross-examination, Officer Murphy was questioned about his original testimony that he "alone" initiated the stop, but Officer Murphy could not recall any testimony to that effect.

¶21    Davis testified last as to the events on the day that he was arrested, and he again testified that he had lost his cell phone the day before while he was

---

[10] Officer Hernandez was questioned regarding the time stamps on the Computer Aided Dispatch (CAD) report associated with the day of Davis's arrest.  He explained that the time stamps on the CAD report might not be entirely accurate depending on when an officer decides to call in his location to the dispatcher.  Thus, the fact that the CAD report indicated that Officer Hernandez arrived at 12:57 p.m. and Officer Murphy arrived at 1:02 p.m. might not be the most accurate indicator of when each officer arrived on the scene the day of Davis's arrest.  Officer Murphy provided similar testimony.

out with some friends, and he was trying to find it. He testified that, as he walked off the porch of a house, Office Hernandez "pulled up on me with his gun drawn, ordering me to the ground at gunpoint." Davis described that Officer Hernandez "put his foot on my back" and "about five minutes later, as the CAD report correctly illustrates, Officer Murphy arrived on the scene of the crime." Davis further testified:

> [Murphy] wasn't there when Hernandez initially saw me standing on the porch. He wasn't there when I walked off the porch. He wasn't there when Hernandez turned his squad car around and came back and got out of his squad car and was talking to me.
>
> He came up exactly five minutes after this incident had taken place. He was over on Maryland, which is exactly six blocks away from Cramer Street[.]

¶22     As to the issue of whether the officers had reasonable suspicion to stop Davis, the circuit court said, "What I do find today though is that Officer[s] Hernandez and Murphy, I find their accounts of what happened here to be credible. They both spoke of, essentially, arriving simultaneously." The circuit court continued, "Now, that leads me to see that today, [] Davis seems to be conforming his testimony to match the documentation." The circuit court noted that Davis appeared to have conformed his testimony to the CAD report when Davis testified that Officer Murphy arrived "exactly" five minutes after Officer Hernandez approached him. The circuit court also identified that Davis at one point also testified at the pretrial hearing that he did not answer the officers when they asked what Davis was doing on the porch of a nearby house. The circuit court also addressed the issue regarding any inconsistency with Officer Murphy's original testimony, saying that Officer Murphy never testified at the first hearing that he was the only one present and has always acknowledged that there were other officers on the scene with him.

11

¶23   Assessing the testimony from the original hearing and the subsequent hearing led the circuit court to say, "I find that Officer Hernandez and Officer Murphy are more credible." The circuit court then stated:

> So as to the credibility, I find that there was reasonable suspicion to stop [] Davis. He fit the description—the physical description—in the same area at the same time of day.
>
> His story was—they found not to be credible. And they—Officer Murphy even went the further step of knocking on the door, saying, "Do you know this person?" And the homeowner who was there said they did not. I think that that is credible.

¶24   As to the question of whether the trial court erred in sending loose photographs to the jury, the circuit court found no issue with the trial court's actions because "essentially, what the jury was asking for is, [']We want to see the six pictures that were shown to the jury or that were shown to the witnesses, that they did that.[']" As a result, the circuit court found that the trial court reasonably exercised its discretion and did not violate Davis's right to present a defense.

¶25   The circuit court denied Davis's motion, and Davis appealed. Due to a change in counsel, the appeal was voluntarily dismissed, and Davis filed the supplemental postconviction motion that underlies this appeal. In his supplemental motion, Davis asked the circuit court to reconsider its prior decision on his postconviction motion and raised additional arguments regarding his claims of ineffective assistance of counsel and perjury from Officer Murphy. The circuit court denied the motion, and Davis again appealed.

## DISCUSSION

¶26   On appeal, Davis raises two main arguments. First, Davis argues that the circuit court erred in denying his postconviction motion because the denial

was based on credibility determinations that are clearly erroneous. Second, Davis argues that the circuit court erred in finding that his right to present a defense regarding the alleged deficiencies in the photo array that Margaret viewed was not violated by the trial court's decision to send loose photographs from the photo array that Oliver viewed to the jury during deliberations.

## I. The Circuit Court's Credibility Determinations

¶27 Davis argues that the circuit court erred when it found the testimony of Officers Hernandez and Murphy more credible than the testimony from Davis, and subsequently denied Davis's postconviction motion. In particular, Davis contends that the circuit court's credibility determination is clearly erroneous because Officer Murphy's original testimony was perjured, Officer Hernandez and Officer Murphy conformed their testimony at the postconviction hearing to subsequently revealed evidence, Davis's testimony remained consistent from the first and second hearings, and Officer Murphy's testimony changed from the first hearing to the second hearing. Without credible testimony from Officers Murphy and Hernandez that they had a non-confrontational and relatively cordial interaction with Davis, Davis argues that there were no articulable facts to support a stop involving firearms and being ordered to the ground. We disagree.

¶28 "When the circuit court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses and the weight to be given to each witness's testimony." *State v. Peppertree Resort Villas, Inc.*, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345. We are bound by the circuit court's credibility determinations, and we will not overturn the circuit court's findings of fact unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2) (2019-20) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard

shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").[11] In this case, we discern no error, clear or otherwise, in the circuit court's decision to credit the testimony from Officers Murphy and Hernandez, and thus, we uphold the decision to deny Davis's motion.

¶29 Davis argues that Officer Murphy's testimony from the first hearing to the second hearing is inconsistent, mainly based on Officer Murphy's description of the presence of other officers at the scene and his initial testimony that he approached Davis first. Davis makes too much of Officer Murphy's testimony that he, and not Officer Hernandez, was the first to approach Davis. Officer Murphy testified that Officer Hernandez arrived "simultaneous" to him, and Officer Hernandez later described that he and Officer Murphy "converged" on Davis at the same time. Officer Murphy never denied that there were other officers present on the day of Davis's arrest, and Officer Murphy consistently testified that other officers—including Officer Hernandez—arrived simultaneous to him. Thus, there is nothing in the record suggesting that Officer Murphy "*clearly lied*" at the first motion hearing in the way he originally described the interaction with Davis that day.

¶30 Davis also argues that the officers "finally got their stories mostly straight," i.e., clearly conformed their testimony to documentation of the arrest, and their testimony should be rejected for this reason. However, we agree with the circuit court that a review of the record reveals that the opposite is true. The hearing transcript instead reveals a proclivity on Davis's part to conform his

---

[11] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

testimony to the CAD report that was discussed heavily at the postconviction hearing. At the original suppression hearing, Davis never suggested that there was any lag between Officer Hernandez's arrival and Officer Murphy's arrival. Instead, Davis's original testimony paralleled the testimony of both officers that they arrived simultaneously when Davis testified that "Officer Murphy jumped out of his squad car and came up to the scene" at the time when Officer Hernandez asked Davis what he was doing there.

¶31    Consequently, it is Davis's testimony that has since changed to where he now testified at the postconviction hearing that there were "exactly" five minutes between when Officer Hernandez stopped him and Officer Murphy arrived on the scene and removed Davis's wallet from his pocket, "as the CAD report correctly illustrates." Accepting this as true would also necessarily lead to the conclusion that Davis was on the ground on his stomach with Officer Hernandez's foot on his back and gun pointed at Davis for about five minutes when Davis, from this position on the ground, identifies Officer Murphy as now present on the scene.

¶32    The circuit court's decision to discredit Davis's testimony to this effect and, instead, credit the testimony from the officers about how the interaction between the officers and Davis occurred is not clearly erroneous. Thus, accepting the officers' version of events, the circuit court properly denied Davis's motion.

## II.    Davis's Right to Present a Defense

¶33    Davis argues that the circuit court also erred when it found that the trial court's decision to send loose photos—not in their manila folders—of the photo array that Oliver viewed to the jury did not violate Davis's right to present a defense regarding the alleged deficiencies in the photo array that Margaret viewed.

15

We are not persuaded that the trial court's decision to remove the photographs from the photo array that Oliver viewed from their manila folders and send just the photographs to the jury violated Davis's right to present a defense about alleged deficiencies in the photo array that Margaret viewed.

¶34    A criminal defendant has a constitutional right to present a defense. *State v. Schmidt*, 2016 WI App 45, ¶71, 370 Wis. 2d 139, 884 N.W.2d 510.

> At a more general level, the test for whether the exclusion of evidence violates the right to present a defense has been stated as an inquiry into whether the proffered evidence was "essential to" the defense, and whether without the proffered evidence, the defendant had "no reasonable means of defending his case."

*State v. Williams*, 2002 WI 58, ¶70, 253 Wis. 2d 99, 644 N.W.2d 919 (citation omitted).  Whether a defendant's right to present a defense has been violated is a question of law that we review *de novo*.  *See Schmidt*, 370 Wis. 2d 139, ¶72.

¶35    Davis argues that the trial court's decision to remove the photos from the manila folders from the photo array that Oliver viewed altered the evidence introduced at trial and "severely undermined" his defense because of how he questioned the reliability of the photo array that Margaret viewed, and the jury's careful questioning of the photo arrays during deliberations.  We disagree and conclude that there is no way that the manila folders in the photo array that Oliver viewed can be called essential to Davis's defense.

¶36    In his brief, Davis explained his defense regarding Margaret's identification of him in the photo array that she was shown:

> Here, defense counsel argued in closing that [Margaret's] identification of Davis in the photo array was subject to question.  That is, on the print-out sheet, Davis was in position four, but [Margaret] picked out the photo that was in the third envelope shown to her.  Further, the

> police did not have [Margaret] sign the back of the photo she identified. Thus, the only evidence of whom [Margaret] identified is the recollection of the police officer.

Although Davis notes that "[u]nlike the photo array shown to [Oliver], with [Margaret] the [S]tate never introduced the envelopes that contained the pictures," he never made any argument during the trial as a part of his defense about the fact that the manila folders in the photo array shown to Margaret were not introduced into evidence. Instead, his defense focused on which photo Margaret chose in the photo array that she was shown.

¶37    Davis never argued in his brief, let alone explained on appeal, how not sending the manila folders from the photo array that Oliver viewed affected his theory of defense—that Margaret did not pick out Davis's photo in the photo array she was shown. Rather, Davis makes the conclusory assertion that:

> The manila folders were an integral part of the exhibit, and they were an integral part of the photo array. That is, the folders were part of the procedure used to display the photos to the witness. By removing the photographs from folders, the judge was implicitly sending the message to the jury that the folders are not an essential part of a photo array.

Although Davis contends that the manila folders were an integral part of the photo array, he does not explain how or why they were an integral part of his defense—namely, that Margaret did not pick Davis out of the array because she picked out

17

the photo that was in the third envelope[12] shown to her while, on the print-out sheet, Davis was in position four.[13]

¶38    We conclude that the manila folders did not play any role in Davis's chosen defense—that Margaret did not, in fact, pick Davis out of the array.  As the State points out, "[t]he unremarkable manila folders from [the photo array that Oliver viewed] would have provided no insight into whether [Margaret] picked out Davis" in the photo array that she viewed.  Thus, the trial court did not deny Davis his right to present his defense when it did not send the manila folders from the photo array that Oliver viewed to the jury.

¶39    We also reject Davis's reliance on *State v. Johnson*, 118 Wis. 2d 472, 479-81, 348 N.W.2d 196 (Ct. App. 1984) (concluding that the trial court's decision denying the jury an opportunity to see photographs was a violation of the defendant's right to present a defense because without the photos, the defendant "had no reasonable means of defending his case").  As apparent from the extensive testimony about the photo arrays during trial, Davis had a reasonable means of defending his case.  Moreover, *Johnson* involved a complete denial of the defendant's request that photos be sent into the jury room during deliberations.  *See id.* at 479-80.  That is not the case here, where the photos were requested by

---

[12] As shown in Davis's arguments, there is no dispute that the manila folders were used in the viewing of both photo arrays by Margaret and Oliver.

[13] This assertion that Margaret picked out a different photo is speculative, undeveloped, and not supported by citation to any legal authority.  Thus, we decline to further consider the assertion.  *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

18

the jury and were sent to the jury room.  Accordingly, we reject Davis's argument that the trial court violated his right to present a defense.[14]

## CONCLUSION

¶40     We uphold the circuit court's credibility determinations and, thus, reject Davis's argument that he was unlawfully arrested when, as he claims, Officer Hernandez approached him with his gun drawn and ordered him to the ground.  We further reject Davis's argument that the trial court violated his right to present a defense when it removed the manila folders from the photos used in the photo array that Oliver viewed, and sent the loose photos to the jury during deliberations.  Accordingly, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[14] Because we address Davis's argument on the merits, we do not address the State's argument that any error on the trial court's part is harmless.  *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("[C]ases should be decided on the narrowest possible ground[.]").